## NICHOLAS POWER CO. v. C. R. BAIRD CO.

(District Court, S. D. New York. March 18, 1915.)

1. PATENTS ☞328—VALIDITY AND INFRINGEMENT—APPARATUS FOR EXHIBITING MOVING PICTURES.

The Power patent, No. 826,112, for apparatus for exhibiting moving pictures, was not anticipated and discloses patentable invention. Defendant, however, *held* not chargeable with contributory infringement.

2. PATENTS ☞36—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.

Unusual commercial success of a patented article is entitled to great weight on the question of invention, when it is otherwise in doubt, as business ability, finely constructed machine parts, and good selling organization cannot accomplish such a result without a basically satisfactory product; and especially is this true where other noted inventors have patented articles for the same purpose which were unsuccessful.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. ☞36.]

3. PATENTS ☞328—VALIDITY AND INFRINGEMENT—FIREPROOF MAGAZINE FOR FILM REELS.

The Power patent No. 959,601, for a fire-proof magazine for film reels, *held* not anticipated, valid, and infringed.

4. CRIMINAL LAW &#9672;&#8658;561—EVIDENCE—SUFFICIENCY—PROOF BEYOND A REASONABLE DOUBT.

    Where a trial judge, on the evidence before him, if sitting as a juror in a criminal case and charged that, if a certain fact in issue was proved beyond a reasonable doubt, defendant was guilty, would vote for a verdict of not guilty, and if, per contra, under a similar charge that, if the contrary of such alleged fact was proved, defendant was guilty, he would likewise vote for a verdict of not guilty, he can be said to have a reasonable doubt on the issue.

    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1267; Dec. Dig. &#9672;&#8658;561.]

In Equity. Suit by the Nicholas Power Company against the C. R. Baird Company and Chester R. Baird for infringement of letters patent No. 826,112, for apparatus for exhibiting moving pictures, granted to Nicholas Power, July 17, 1906, and No. 959,601, to the same patentee, May 31, 1910, for a fireproof magazine for film reels. Dismissed as to first patent, and decree for complainant against defendant company on the second.

Edmund Wetmore, Oscar W. Jeffery, and W. Brown Morton, all of New York City, for plaintiff.

Messimer & Austin, of New York City (Albert M. Austin, of New York City, of counsel), for defendants.

MAYER, District Judge. This litigation involves two patents in the motion picture art, and, from the nature of the controversy, these must be separately considered. On the trial, one was familiarly called the "framing device" and the other the "fire valve."

## The Framing Device Patent.

[1] "This invention," says Nicholas Power, the patentee, "relates to apparatus for displaying moving pictures, and more particularly to apparatus for displaying pictures which are arranged in series upon a translucent film, which is fed intermittently across a projection aperture in front of a suitable source of light for illumination. The object of the invention is to improve apparatus of the type specified in respect to the devices employed for feeding the film across the projection aperture, and with respect also to the means employed for framing or centering the pictures in relation to the projection aperture."

Claims 2, 3, 4, and 5, when read in connection with the patent drawings, may be analyzed as follows (the elements of the combination being identified with the drawings by reference numerals):

"2. In apparatus for exhibiting moving pictures—

    (a) A *shiftable carriage* (28);

    (b) *Film-feeding mechanism* (pinion 39, Geneva driving wheel 31, and stop wheel 30 and sprocket 26), mounted on the carriage;

    (c) A *main driving gear* (12), turning about a *fixed axis* (5); and

    (d) *Shiftable intermediate gearing* (37 and 38), constantly in operative connection with said driving gear (12) and said film-feeding mechanism (39), etc.

"3. In apparatus for exhibiting moving pictures—

    (a) A *shiftable carriage* (28);

    (b) *Film-feeding mechanism* mounted on said carriage and comprising a *pinion* (39);

(c) A *main driving gear* (*12*), turning about a fixed axis (*5*);

(d) *Intermediate gearing* (*37* and *38*) between said main driving gear (*12*), and said pinion (*39*), and constantly in mesh with both, said intermediate gearing moving in an arc having the axis (*5*) of the main driving gear (*12*) as a center.

"4. In apparatus for exhibiting moving pictures—

    (a) A *main driving gear* (*12*), turning about the fixed axis (*5*);

    (b) A *shiftable film-feeding mechanism,* including a *pinion* (*39*);

    (c) A *pair of detachably connected links* (*34* and *35*), one of such links (*34*) turning about the axis (*5*) of the main driving gear (*12*), and the other (*35*) turning about the axis (*33*) of said pinion (*39*); and

    (d) *Intermediate gearing* (*37* and *38*) connecting said main driving gear (*12*) and said pinion (*39*), said intermediate gearing (*37* and *38*) being mounted on the pivot (*36*) connecting said links (*34* and *35*).

"5. In apparatus for exhibiting moving pictures—

    (a) A *fixed projection aperture* (*7*);

    (b) A *carriage* (*28*), arranged for *vertical movement* beneath said projection aperture (*7*);

    (c) A *main driving gear* (*12*), turning about a fixed axis (*5*);

    (d) *Film-feeding mechanism* (*39, 31, 30* and *26*), mounted on said carriage (*28*); and

    (e) *Shiftable intermediate gearing* (*37* and *38*), constantly in operative connection with said main driving gear (*12*) and said film-feeding mechanism (*39*)."

The defenses are invalidity and noninfringement.

## The Validity of the Patent.

When Nicholas Power entered this field, the motion picture art was about a dozen years old, but as yet in its early stages, and much was still to be accomplished in the successful projection of motion pictures, both from a scientific and commercial standpoint. The problem presented over the old magic lantern was that, instead of projecting a single picture, the motion picture projector deals with a series of successive instantaneous pictures of moving objects in such rapid succession that the eye cannot follow the change from one picture to another, but sees the changes in position of the moving objects as a gradual transition closely simulating the appearance of natural movement.

The pictures to be exhibited were produced as far back as the late '90's in their present form of a long narrow band of celluloid films with marginal sprocket holes or perforations, and containing a series of instantaneous photographs taken at intervals of one-sixteenth of a second, and designed to be exhibited at the same rate of 16 pictures to the second to reproduce natural movement. The early development of the art determined that it was essential to the production of a motion picture to maintain the picture stationary during its interval of projection, to cut off the light from the film during the interval of movement, to advance the next picture into position for projection, and to give the picture a longer interval of rest than the interval of movement. In addition to the mechanism for feeding and holding the film and the shutter for cutting off the light from the film, machines have from the first been provided with a "sight opening" of the size of the individual pictures in the film to give an even "border" to the picture on the screen. It was early discovered that some means must be provided to permit a relative adjustment of the film and the "sight opening" or aperture,

as now called, because even with the short lengths of film then used (50 or 100 feet) the original registration of the picture and opening would be disturbed by imperfections in the sprocket holes, splices in the film and the like, and necessitate readjustment or "framing of the picture" to continue the exhibition.

The patent in suit is not directed to an entire moving picture projecting apparatus, but to a portion of it, and the claims in suit are all directed to the construction for permitting the framing of the picture. It will be appreciated, at the outset, that the subject-matter involved delicate mechanism and accurate interrelation, all looking to a result which would accomplish the illusion (if it may be so called) most effectively. In an art of this character and mechanism of this delicacy, sometimes the omission or addition of merely a single element rises to the dignity of invention, and it is with this appreciation and this mental attitude that the subject must be approached. The prior art defense involves a consideration of the patents to Eberhard Schneider (United States letters No. 647,529) and Prestwich (British) and several prior use machines produced and testified about.

(a) In the structure known in the case as the first Edison machine, all the parts except the aperture plate were stationarily mounted, and the framing of the picture was accomplished by adjusting the aperture plate up or down as might be necessary for its opening to register with the picture.

Objection: The position of the picture on the screen before the audience was shifted up and down by the adjustment of the aperture plate, and, besides, the position of the film with regard to the focus of the lens varied.

(b) In the second Edison (Exhibit Q), the aperture plate was the only part of the machine to be fixed, while the film-feeding mechanism was adjustable up and down, as might be necessary to bring the picture into registration with the lens and aperture plate.

(c) In the "modified Edison" (Exhibit X), the machine frame is mounted on guide rods, instead of runways.

(d) In the Schneider modified Edison (Exhibit C), the original rack and pinion for adjusting is replaced by a crank and screw.

(e) The two early Power' machines (Exhibits T and U) show the idea of the entire mechanism adjustable on its own front boards.

None of these structures shows the combination of the claims, and each lacks many of the elements. It is enough to point out that, among other things, they do not have a separate shiftable carriage nor a shiftable intermediate gearing.

(f) The Schneider machine (Exhibit B). Eberhard Schneider, at one time a member of the German navy, first became interested in the motion picture business in 1895 in Essen, Germany, when he was head draughtsman at the Krupp works, and while there made his first projecting machine. He came to this country shortly after, and in 1896 made a machine which he called the Wondroscope. This did not have a framing device. Schneider's next type, of which he made two, and which he named the American Cinematograph, was made in 1897, and did not have a framing device. Later in 1897 he made two more ma-

chines, calling them also the American Cinematograph; but these had a framing device, and one of them, known as Model 1897 No. 3, is Exhibit B in this case.

Schneider is a man of superior ability, intelligent, persistent, and possessed of that ability for and patience with detail which is characteristic of men of science and of artisans of Germanic ancestry. He understood perfectly what it was necessary to accomplish and he set about to do it. His fundamental and, in the art, advanced thought was to construct a machine having a stationary frame with fixed main shaft and stationary aperture plate, in which the framing would be accomplished by adjusting the distance between the intermittent sprocket and the aperture plate. But, when Schneider came to concrete his thought into a physical structure, he just missed making a machine which was commercially successful. Comparing Exhibit B with the machine of the Power patent, we find:

(1) That there is not the "vertically adjustable carriage." Instead, the shaft of Schneider's intermittent sprocket is carried by a pair of "cheeks" mounted to swing in the arc of a circle on the axis of the main shaft, and the whole arrangement is such that the adjustment of the cheeks swings the sprocket toward and away from the aperture which is formed in the frame above the main shaft.

(2) That in Schneider there is an oscillatory movement of the pair of cheeks, while in Power the movement of the shiftable carriage is vertical.

(3) That in Schneider, contrary to Power, there is really no intermediate gear, and no shiftable intermediate between the main driving gear and the film-feeding mechanism; the latter being driven directly from the main shaft.

It is unnecessary to go on with the details, for, giving to the Power the fair construction to which it is entitled, the Schneider Exhibit B cannot be successfully read against a single Power claim in controversy, nor can it be held that the Power mechanism is an equivalent of Exhibit B.. If, however, a doubt as to invention were entertained (and I entertain none), the remarkable commercial success of the Power would conclusively resolve the doubt.

[2] The usefulness of a trial in court in cases of this kind is here well demonstrated. While the lawyers who participated in this case were trudging their way, on many days a few years ago, to the courthouse, Power was starting his inventive career in a little workshop in one of the buildings on Nassau street. Edison and Schneider were striving for a result, but Power attained it, and to-day his machine concededly dominates the market and its sales are remarkable. The little workshop has risen to a large business enterprise, while Edison's machine has lagged far behind, and Schneider (who, I hope, will some day hit the right thing) is doing business in a modest way on Second avenue.

Business ability, finely constructed machine parts, and a good selling organization cannot accomplish such a result without a basically satisfactory product. We are not dealing with some pleasing article, which,

for the time being, catches the public, but with a delicate mechanism, which, to succeed, must consistently make good with the exhibitor and the audience. I am fully convinced that the patent is meritorious and should be sustained.[1]

### Infringement.

While the bill charges direct and contributory infringement, no case of direct infringement was made out nor attempted, and only a single instance of alleged contributory infringement is testified to.

Here again we have some more human nature. The Power and Baird concerns were on intimate and friendly business relations for a long time. Baird furnished Power with important and delicate parts for the Power machine. Later a break occurred in the relations, and the controversy has grown unpleasantly bitter.

Baird is an able, energetic business man, and a good fighter when the fight is on; but in his methods I think he is honest, truthful, and above-board. The evidence abundantly demonstrates that Baird has stood on the merit of his product, and that he has sought to establish a reputation for his goods as "Baird" parts. He has the right to sell the parts he advertises in his company's circulars, so long as the sales are not for rebuilding.

It is fair to assume that plaintiff has made every effort to discover whether Baird has been a party to a sale for rebuilding, and the Schneider, Springfield, Mass., incident is the only result of the quest. The transcribed testimony of Charles E. Schneider reads quite differently from the way it sounded. By this I mean that it was necessary to see and hear Schneider to understand what took place.

The fact is (and so plaintiff conceded) that the letter written by Schneider to the Baird concern was so written at the instance and request of a representative of plaintiff. There was no impropriety in this course, because such methods are often the only available means whereby infringement can be discovered. This letter was dated April 25, 1913, addressed to defendants, and is as follows:

"Dear Sir: Your letter of the 24th caught me after breakfast, but not unawares. Consequently, expecting something similar from you, I sat down and wrote out a check for the balance of my account. I do not know how I stand with you for the future, but please send me the following parts according to your catalogue, which I need for rebuilding two second-hand machines which I have on hand: [Here follows an enumeration of parts for the Power No. 5 and the Power No. 6 machines.] Besides the above numbers, please send me two dozen belt couplings and one upper gear, with spindle, for your Baird rewinder.

"Please let me know by return mail how you will deliver the goods, on credit or otherwise, and let me know the amount, which I figure will be forty some odd dollars, and I will send you a remittance for same by return mail.

"Trusting to hear from you, I am yours very truly,

"Dict. CES/KB                                           Chas. E. Schneider."

The answer of Baird was in the breezy style affected in some lines of business, and stated, in substance, that all the desired parts could

---

[1] NOTE.—I think it unnecessary to discuss the Prestwich (British) patent.

not be supplied because they were not on hand, but that the superintendent of the Baird Company was—

"now hard at work on all parts of which our stock is exhausted, and we will soon have any old thing you may require. * * * Under all the circumstances, about the only thing I can do at the time of going to press is to inclose invoice for the parts we have in stock, which can be shipped as soon as we hear from you, and hope you will instruct us by return mail to get these forward."

Unless a sale of parts for rebuilding was intended by defendants, I believe that the word "rebuilding," as used and placed in this letter, carried no emphasis to the mind of the reader. The parts shipped would, in no sense, rebuild the machine, and a busy business man would need a mental microscope to pick out the word "rebuilding" in Schneider's letter as conveying to him what plaintiff contends.

It is unnecessary for me to attempt to define where repairing ends and rebuilding begins. That is always a question of fact, which must be determined upon the testimony and its fair inferences in each case. Very often, in cases involving the furnishing of repair parts, the course of business, the methods employed, and the circumstances under which the sale is made, indicate a purpose or intent which leads to the conclusion that by devious ways infringement has been accomplished.

It is not requisite to discuss the testimony on this branch of the case in detail, for such discussion would involve too elaborate a quotation from or reference to the testimony. It is enough for me to state that on the evidence in the case I am satisfied that the defendants have not intended to be parties to the rebuilding of plaintiff's machine, have pursued a course of business quite to the contrary, and in point of fact in the Schneider sale were not guilty of contributory infringement. Shickle Co. v. St. Louis Car Coupler Co., 77 Fed. 739, 23 C. C. A. 433.

As it is always desirable to end or prevent litigations, I may intimate that there may be limits beyond which defendants cannot safely go; but, if trouble should arise in the future, it must be dealt with upon the facts as they may be then presented.

## The Fire Valve.

[3] "The object of the present invention," says the patentee, "is to provide a magazine for the film-reels of moving picture exhibiting machines of such construction that it will be thoroughly effective in preventing fire from reaching the reel of film inclosed in the magazine and will cause no rubbing friction upon the film as it passes into or out of the magazine. A further object of the invention is to provide a magazine of the character specified which will be simple, inexpensive, and durable and entirely positive in its operation."

Here there are five claims, any one of which is sufficiently illustrative for all, and therefore I shall content myself with quoting claim 1, which is as follows:

"1. A magazine for inflammable films, comprising a casing or housing of noninflammable material, a narrow guideway or passage having closed sides projecting from the casing, through which the film must pass into said casing or housing, and guiding means external to the casing or housing associated

with said guideway or passage to prevent rubbing contact of the film with said guideway or passage."

In the early days of the art, the necessity for fire protection was not great; but that necessity has grown increasingly urgent with the development of the business and the consequent higher requirements, and, in New York, apparently closer supervision of the municipal authorities.

We all know that motion picture exhibitions are attended daily by many thousands of people, and we all appreciate the danger which would result, not only from fire, but more seriously, perhaps, from panic. Thus any instrument of fire protection becomes important which shall instantaneously extinguish fire and be so constructed and adjusted as not to scratch nor impair the film.

The prior art defenses may be divided into (1) prior patents and (2) prior use devices. The paper art (Granichstaedten patent of February 5, 1901, Hughes British patent of 1902, and Weiser patent of February 13, 1906) neither anticipates nor negatives invention.

The previous Power patent, No. 809,981, dated January 16, 1906, was constructed differently from the device of the patent in suit. This previous Power fire valve had no casing of noninflammable material, no narrow guideway, no plurality of rollers, and no shiftable roller with its axis in inclined slots.

What the art needed from an efficient and commercial standpoint was a fire protection device which would also protect the film. It must be remembered that the film travels at the rate of 16 pictures per second, that splices are not unusual, and that scratching either destroys or impairs the film to the extent of seriously deteriorating the picture which is thrown on the screen.

Eberhard Schneider produced three valves, known as Exhibits I, J and K. I am entirely satisfied that Schneider's recollection was right in putting the date of these exhibits prior to 1906. Exhibit K need not be considered. Exhibits I and J doubtless put out fire, how efficiently is problematic; but they do not prevent scratching, and they are sufficiently crude to be a long distance away from the Power fire valve.

Indeed, Schneider had little appreciation of the possibilities of this character of device, and, in my opinion, it required a faculty more than ordinarily to be expected from the man skilled in the art to produce the Power valve over the Schneider valves, and Schneider's failure is strong evidence of Power's success. Indeed, the prior art in respect of this device, which now looks so simple, but which was unattained by others, is, to my mind, convincing proof that what Power accomplished in this regard was invention. Anderson v. Collins, 122 Fed. 451, 58 C. C. A. 669.

I should have no difficulty if I could stop here, but there was produced by Earle M. Wooden a valve which has become known in this suit as Exhibit O, or the Wooden valve. If prior use (not merely experimental) of the Wooden valve had been successfully established, I would have had no doubt that the Power patent would have been invalid as against Wooden's valve.

It seems that in 1903 Wooden and his brother-in-law, Unfried, were

experimenting in the making of a machine for moving pictures; Unfried, and a part of the time Wooden, being then in the employ of the Yale & Towne Company at Stamford, Conn. While engaged in this work Wooden and Unfried produced a valve which they testified was the reconstructed Exhibit O. This valve, at some later date which does not accurately appear, was dismembered and thrown into a sort of junk heap in a shop in New York City in which Wooden had some interest, and was apparently forgotten for a long time. Wooden is an intelligent man, with presumably considerable mechanical and perhaps inventive ability, who has studied moving picture machines and has been working on mechanical contrivances in that art. He testified that he had given a number of exhibitions of moving pictures in different places prior to 1906; but he remembered, with any definiteness, only two prior to 1906 at which Exhibit O was used. One of these was at Port Chester, N. Y., and the other, as he first testified, at Nilsson Hall in New York City.

Wooden was subjected to a close examination by the court, and an extended cross-examination by counsel for plaintiff, and when, as we all supposed, the trial had ended, I was fully satisfied that Wooden was right in his recollection, and I was well impressed with him as a truthful and straightforward man. As the result, however, of some investigations made at the instance of plaintiff, I opened the case for further hearing in respect of the Port Chester and Nilsson Hall incidents.

It appeared that Nilsson Hall did not exist at the time that Wooden believed, in the first instance, that he had given an exhibition there, and defendants then sought to show that Wooden had made an honest mistake in recollection, and that the exhibition had, in fact, been given at Teutonia Hall, which is very near to Nilsson Hall. Naturally this interesting incident reopened the question in my mind.

By a process of elimination the plaintiff succeeded in creating substantial doubt as to the correctness of Wooden's testimony in respect of the Port Chester exhibition, and as to that I have an affirmative doubt. I do not wish to be understood as stating that I do not believe that Wooden gave the exhibition at Port Chester, but I do believe that he is in error as to his date.

[4] As to the Teutonia Hall exhibition, I may say that it is entirely clear that such an exhibition took place, and, in this regard, Wooden is corroborated by credible and disinterested witnesses; but I cannot say that he has satisfied me beyond a reasonable doubt that Exhibit O was used on the occasion of the production of the "Passion Play" at Teutonia Hall.

This case has given me some practical realization of what a jury contends with when the court charges the doctrine of reasonable doubt in a criminal case, and after much consideration and a good deal of debate with myself I can only say that I am not convinced beyond a reasonable doubt. In other words, if, sitting as a juror, I were charged that, if I believed that it was proved beyond a reasonable doubt that Wooden had used the valve at the time in question, then he was guilty, I would bring in a verdict of not guilty; and if, per contra, I were similarly charged that, if Wooden had not used the valve at the time in

question he was guilty, I should likewise bring in a verdict of not guilty —and both results would be because I entertained a reasonable doubt.

But there is something besides the question of reasonable doubt upon this branch of the case. I think that, even if Wooden's recollection is right, the testimony shows that the valve and the machine with which it was made were experimental and afterwards abandoned. Wooden evidently had no appreciation of what the valve accomplished, and, instead of giving something to the world, he consigned the structure literally to the junk heap, where doubtless it would have still remained, had this litigation not occurred.

In what has been observed supra I am to be understood as not reflecting in the slightest upon the uprightness of Wooden. He looks and acts like an honest and truthful man; but experience in the courtroom teaches that honest men, after much thought and talk about just such an incident as this, sometimes become confused as to dates, and reiteration in conversations is often transmuted into a recollection honestly believed in, but inaccurate in point of fact.

As there is no question of infringement on this branch of the case, I conclude that this patent is valid, and infringed by defendant company; and, in so doing, I am of opinion that the transaction between the parties did not put the defendant company in the position of an implied licensee. I do not recall any testimony upon which infringement can be found against Baird individually.

A decree may be presented in accordance with this opinion, but there will be no award of costs.